UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAQUILLE TOBY,<br><br>                Plaintiff,<br><br>v.<br><br>PORTO SALVO LLC d/b/a MINATO BRONX, and LUIGI GHIDETTI,<br><br>                Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Shaquille Toby ("Plaintiff" or "Mr. Toby"), by and through his attorneys, Mesidor PLLC, against Porto Salvo LLC d/b/a Minato Bronx ("Minato" or the "Restaurant") and Luigi Ghidetti ("Ghidetti") (collectively, "Defendants"), alleges as follows:

**NATURE OF THE CASE**

1. Minato Bronx, a restaurant nestled in the heart of the South Bronx, subjected its bartender, Shaquille Toby, the only Black employee, to a rampant campaign of vile racial harassment lasting over six months. A former Minato Bartender and a handyman Tomas Carmelo Batazar and Isais Adelfo Mejia, who frequented the Restaurant with Defendants' knowledge and tacit blessing, called Mr. Toby "nigger" and screamed "fuck that Black" three to four times per week for over half a year. Over time, this rose to violence and physical threats. Racist slurs carved into the bench outside the Restaurant represented the relentless racism that went unchecked inside its doors.

2. When Mr. Toby dared to complain, Defendants punished him, stripping his hours in half and subjecting him to new, arbitrary rules. Owner Luigi Ghidetti and Manager Ali Hernandez witnessed the harassment, received complaints from Mr. Toby and other employees, saw the racist graffiti carved into the bench, and watched the violence unfold inside the Restaurant

during business hours in front of customers. Yet Defendants refused to take any action to protect Mr. Toby.

3. On February 8, 2026, Defendants abruptly closed the Restaurant. In March 2026, Minato reopened—but Defendants never contacted Mr. Toby about returning, effectively terminating his employment.

4. Plaintiff brings this action alleging that Defendants violated Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* (the "NYCHRL"). Plaintiff seeks declaratory relief, injunctive relief, compensatory and punitive damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves claims pursuant to federal law.

6. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff's claims under Section 1981 are brought to recover damages for deprivation of equal rights.

7. This Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this district because a substantial part of the events and omissions giving rise to the claims occurred in this judicial district, as Defendant Minato operates in the Bronx, New York.

## PARTIES

9. Plaintiff Shaquille Toby is a resident of Brooklyn, New York.

10. Plaintiff is a Black man who worked for Defendant Minato as a bartender from July 3, 2025, until Defendants terminated his employment on February 8, 2026.

11. At all relevant times, Plaintiff was an "employee" within the meaning of Section 1981, the NYSHRL, and the NYCHRL.

12. Defendant Porto Salvo LLC d/b/a Minato Bronx is a limited liability company with its principal place of business located at 407 E 161st Street, Bronx, New York 10451.

13. Defendant Minato operates a restaurant and bar in the Bronx, New York.

14. At all relevant times, Defendant Minato was an "employer" within the meaning of Section 1981, the NYSHRL, and the NYCHRL.

15. Defendant Luigi Ghidetti is an individual engaging in business in this judicial district during the relevant time period. Defendant Ghidetti possesses operational control over Defendant Minato, an ownership interest in Defendant Minato, and controls significant functions of Defendant Minato. He has the authority to control wages, conduct discipline, and hire and fire employees.

## FACTUAL ALLEGATIONS

### I.    Plaintiff's Employment History and Initial Role at Minato

16. Plaintiff began working as a bartender at Minato on July 3, 2025.

17. Defendant Ghidetti and Manager Ali Hernandez supervised Plaintiff from the outset of his employment.

18. Plaintiff earned $11 per hour plus tips, paid entirely off the books.

19. His responsibilities included typical bartending duties—serving customers, managing the bar, and handling transactions. Beyond these core duties, Plaintiff also performed as a DJ at the Restaurant, a valued aspect of his position that allowed him to enhance the customer experience

and contribute to Minato's atmosphere. Plaintiff took pride in this role, and the neighborhood regulars appreciated his work.

20. Plaintiff brought energy, dedication, and professionalism to Minato. He built strong relationships with regular customers and worked diligently to contribute to the Restaurant's success.

21. However, unchecked racial animosity quickly turned Plaintiff's employment at Minato into a real-life nightmare.

## II.     Pattern of Severe and Pervasive Racial Harassment

22. Beginning in or around September 2025, Tomas Carmelo Baltazar, a former bartender at Minato, and Isais Adelfo Mejia, a handyman at the Restaurant, subjected Plaintiff to a relentless campaign of racial harassment that would continue for months.

23. Baltazar and Mejia repeatedly called Plaintiff "nigger" and said, "fuck that Black," referring to Plaintiff in front of customers and other employees at Minato.

24. This racist verbal abuse occurred at least three to four times per week, over a period of approximately six to seven months.

25. Baltazar and Mejia also spread false and damaging information about Plaintiff at Porto Salvo, the bar directly across the street from Minato, where many of the neighborhood regulars also frequented.

26. Baltazar and Mejia falsely claimed that Plaintiff ripped off customers, failed to inform customers of the automatic 18% gratuity charge, and provided poor service.

27. These malicious lies poisoned the regulars against Plaintiff. Customers who once loved and respected Plaintiff began to hate him and joined in harassing, racist conversations about him.

4

28. This calculated campaign of defamation severely damaged both Plaintiff's professional reputation and Minato's business, causing sales to decline dramatically.

29. Baltazar also shared these false accusations with Ghidetti, who accepted them as true without question, never allowing Plaintiff to explain his perspective.

30. Ghidetti automatically sided with Baltazar, took his anger out on Plaintiff, and began treating Plaintiff with open distrust and disrespect. This bias against Plaintiff was unmistakable and demonstrated a refusal to treat Plaintiff with the basic respect afforded to non-Black employees.

31. Compounding the racial harassment, racist graffiti remained visible throughout Plaintiff's employment, a permanent fixture that Defendants made no effort to remove or address.

32. Specifically, someone scratched "FUCK ALL THE FUCKING NIGGERS" and "FUCK U NIGGER" into the bench outside the Restaurant. The graffiti stood as a constant, visible reminder of the hostile and racially charged environment Plaintiff endured daily.

**III.    Escalation to Physical Violence and Death Threats**

33. The harassment escalated from verbal abuse and written slurs to physical violence and death threats in late December 2025 and January 2026.

34. On December 30, 2025, at approximately 8:00 p.m., Baltazar walked into Minato searching for Plaintiff. Baltazar stood in front of Plaintiff, staring at him with a look of disgust, hate, and rage for approximately thirty seconds to one minute. The menacing stare alone conveyed the threat.

35. On January 4, 2026, at approximately 8:00 p.m., Mejia stormed into the Restaurant yelling racial slurs and pointing at Plaintiff.

36. Mejia then stormed into the dish room, breaking objects in a violent rage.

37. Chef Marco (last name unknown) protected Plaintiff as Mejia placed his fist near Plaintiff's face and stuck his middle finger up at him.

38. Multiple customers witnessed this violent outburst.

39. The violence escalated further on January 30, 2026, at approximately 9:00 p.m., when Baltazar attempted to physically assault Plaintiff. Baltazar advanced toward Plaintiff with a knife in his hand. Chef Marco stepped in to protect Plaintiff. Baltazar punched Chef Marco in the face and violently clenched Chef Marco's right arm.

40. Earlier that same evening, Plaintiff had warned a Black customer that she should "be careful, those are the two racists," referring to Baltazar and Mejia.

41. Baltazar smiled and said, "Yeah, she's aware of that," sinisterly acknowledging and embracing his racism.

42. On another occasion, coworkers informed Plaintiff that Baltazar and Mejia stated they were "watching" and "studying" Plaintiff's schedule. Baltazar and Mejia were planning future attacks and tracking Plaintiff's movements to maximize their opportunities to harm him.

43. Mejia and Baltazar also began targeting Plaintiff with death threats and kidnapping threats.

44. Plaintiff's fear for his safety became so intense that he began arriving to work at different, unpredictable times to avoid being attacked by Mejia and Baltazar.

45. Coworkers also informed Plaintiff that Mejia entered Minato looking for Plaintiff while he was not there on multiple occasions.

## IV.    Management's Knowledge and Deliberate Failure to Protect

46. Defendants knew about the ongoing racial harassment, physical assaults, and death threats against Plaintiff.

47. Plaintiff complained repeatedly to management about the dangerous and hostile environment Baltazar and Mejia created. In January 2026, Plaintiff made a complaint in the community group chat, which was promptly deleted by Hernandez. In early February 2026, Plaintiff again complained verbally to Ghidetti about Baltazar and Mejia's racist conduct, including the assault. Ghidetti did not care.

48. In February 2026, Plaintiff made a second outcry to the community group. This time, Hernandez removed him from the group.

49. Coworkers witnessed and reported the harassment and violence to management. For example. On February 6, 2025, Bartender Marco Abalos told Ghidetti that Plaintiff was upset because the Restaurant was not doing anything to protect Plaintiff from the harassment and assaults. Ghidetti responded that Plaintiff was making everything up and that it was Plaintiff's problem.

50. The racist graffiti remained visible on the bench outside the Restaurant for months.

51. The violence occurred inside the Restaurant during business hours in front of other employees and customers.

52. Yet Defendants deliberately refused to take any protective action. Instead, Defendants allowed both men to continue frequenting the Restaurant, where they continued to harass and threaten Plaintiff.

53. After Plaintiff complained about Baltazar and Mejia's racist conduct, Ghidetti began avoiding speaking directly to Plaintiff about normal work matters, instead communicating through other employees to relay messages.

54. Despite Plaintiff's deteriorating safety and repeated requests, Ghidetti refused to fix the cameras, which became nonfunctional around early November 2025. The absence of

functioning security cameras left Plaintiff vulnerable and without any video documentation of the ongoing harassment and violence.

55. Additionally, Baltazar and Mejia continuously refused to pay their bar tabs based on Plaintiff's race.

56. For example, Baltazar and Mejia accumulated an unpaid tab of $105.35 dating from the end of December 2025. When a different employee presented the tab to Baltazar and Mejia, they said, "fuck that Black," refusing to pay because a Black man, Plaintiff, had served them. On information and belief, Defendants never made Baltazar or Mejia pay this bar tab.

57. On January 30, 2026, Baltazar and Mejia attempted to walk out on another tab, and their friend had to pay it for them.

58. Even after these repeated incidents, Ghidetti took no action against Baltazar and Mejia, but instead directed anger at Plaintiff, yelling at Plaintiff and claiming it was Plaintiff's fault that Baltazar and Mejia refused to pay.

59. On February 6, 2026, it became clear that Ghidetti no longer wanted to sit near Plaintiff as had been done previously.

60. Plaintiff learned that Ghidetti told other employees, including Abalos, that he no longer wanted to talk to Plaintiff. When a coworker informed Ghidetti that Plaintiff was upset because he was not doing anything to help Plaintiff or defend him from the racist attacks, Ghidetti responded that Plaintiff was "making everything up." Ghidetti stated that the harassment, violence, and death threats were Plaintiff's "problem," completely abdicating Defendants' responsibility as an employer to provide a safe workplace.

8

61. On February 9, 2026, after the Restaurant closed, coworkers informed Plaintiff that Ghidetti finally talked to Baltazar and Mejia about their conduct—but only after Defendants had already shut down the business.

62. Baltazar and Mejia told Ghidetti that they did nothing to Plaintiff. Ghidetti believed them without further inquiry.

63. Ghidetti never spoke to Plaintiff about his side of the story despite months of complaints and several witnesses.

64. Ghidetti's refusal to speak with Plaintiff while accepting the perpetrators' denials at face value contributed to the hostile environment.

65. Manager Hernandez also failed to protect Plaintiff and instead actively participated in creating a hostile environment.

66. Hernandez threatened Plaintiff, telling him to "stay far away" from the Restaurant.

67. Weeks earlier, Hernandez had characterized Plaintiff's complaints about the racist harassment and death threats as "drama" and, like Ghidetti, said it was Plaintiff's "own problem." When Plaintiff stated, "I am a Black man defending myself," Hernandez responded, "No you are not."

68. The Restaurant had no Human Resources department, and Ghidetti was regularly away, leaving Plaintiff with no one to turn to for help.

69. When Plaintiff reached out to the community group chat in vulnerability and desperation, Hernandez silenced him by deleting his message and removing him from the group. This deletion also eliminated potential evidence of Plaintiff's complaints and the hostile environment he endured.

**V.      Unlawful Retaliation Following Plaintiff's Complaints**

70. After Plaintiff complained about the racial harassment, violence, and death threats, Defendants retaliated against him with multiple adverse employment actions designed to force him out of his job.

71. Defendants reduced Plaintiff's hours by approximately 50%, causing a dramatic loss of income.

72. Defendants also implemented an inconsistent pay schedule, leaving Plaintiff uncertain when he would receive his wages. Ghidetti would randomly walk in and drop off pay without any communication or schedule.

73. This erratic and unreliable pay practice placed Plaintiff in financial distress.

74. Ghidetti and Hernandez implemented random new restrictions to further limit and humiliate Plaintiff.

75. Ghidetti and Hernandez stripped Plaintiff of his DJ duties at Minato, removing a valued and important aspect of his position that he had performed successfully for months.

76. Ghidetti also suddenly forbade Plaintiff from wearing his coat at work, even when the Restaurant was freezing cold. This restriction had never existed before Plaintiff complained.

77. Ghidetti maintained complete silence and refused to communicate with Plaintiff about anything, leaving Plaintiff in the dark about his schedule, pay, and job status. This isolation and communication blackout created uncertainty and distress.

**VI. Fabricated Allegations and Destruction of Plaintiff's Professional Reputation**

78. On February 5, 2026, Hernandez falsely informed Ghidetti that Plaintiff had consumed half a bottle of alcohol and left it in a random location at the bar—a fabricated accusation designed

to provide Minato with a pretext to fire Plaintiff in retaliation for his complaints of racial discrimination.

79. Ghidetti immediately began an investigation with the intent to terminate Plaintiff.

80. Ghidetti and Hernandez also raised a fabricated allegation that Plaintiff was responsible for an alleged $50 discrepancy.

81. These false accusations arose immediately after Plaintiff made his second outcry to the community group chat about receiving harassment and threats from Baltazar and Mejia over the prior months.

82. Ghidetti and Hernandez were "teaming up" to eliminate Plaintiff and permanently ruin his reputation as retaliation for his protected complaints.

83. On February 5, 2026, Hernandez disclosed private, sexually explicit information about Plaintiff to an employee and customer.

84. Hernandez included details about sexual encounters between herself and Plaintiff from two to three years earlier, which occurred before either she or Plaintiff worked at Minato.

85. Hernandez made derogatory sexual remarks intended to humiliate Plaintiff, damage his reputation, and retaliate against him for complaining about the racist harassment and death threats.

86. On February 6, 2026, at approximately 9:00 p.m., Ghidetti and Hernandez falsely accused Plaintiff of giving discounts or manipulating a check for $21.23.

87. Specifically, two guests had requested their bill be split, and one guest walked out on their unpaid portion of the bill while Plaintiff was attending to his other responsibilities.

88. Ghidetti and Hernandez prioritized investigating this $21.23 check over the month-old $105.35 tab that Baltazar and Mejia still refused to pay. This double standard demonstrates Defendants'

11

discriminatory focus on manufacturing reasons to terminate Plaintiff's employment while ignoring the racist perpetrators' refusal to pay a substantially larger debt.

89. Coworkers also informed Plaintiff that Baltazar and Mejia continued making numerous insults about Plaintiff inside Minato on his days off.

90. Baltazar and Mejia repeatedly said, "fuck that Black." On another occasion, Baltazar said, "Fuck that guy. He's gonna pay for it. He's my bitch. He's going to pay for it."

91. These ongoing threats and racial slurs occurred inside the Restaurant with Defendants' knowledge, yet Ghidetti and Hernandez took no action to stop them or protect Plaintiff.

## VII.    Abrupt Restaurant Closure and Termination

92. On February 8, 2026, at approximately 8:00 p.m., Ghidetti entered Minato while customers were present and yelled at everyone to "get the fuck out" and give him the keys.

93. Ghidetti ordered all employees to leave immediately and closed the Restaurant abruptly with no advance notice and no explanation.

94. The next day, on February 9, 2026, Plaintiff filed a complaint with the NYC Commission on Human Rights.

95. Ghidetti openly expressed anger at employees who defended Plaintiff. On February 9, 2026, coworkers informed Plaintiff that Ghidetti told them, "Keep defending your friend," referring to Plaintiff.

96. On February 12, 2026, at approximately 9:00 p.m., Plaintiff received his "final" pay one day late.

97. Coworkers informed Plaintiff that they were unsure whether the business was temporarily or permanently closed, or whether they were still employees, furloughed, or fired. Some

12

employees, including Abalo, were immediately asked to work at Ghidetti's other restaurant, Porto Salvo.

98. Defendants refused to provide any clarity about the closure, the employees' status, or whether anyone would be recalled. The deliberate ambiguity left Plaintiff in limbo and without income.

99. In March 2026, Minato reopened. However, Defendants never contacted Plaintiff regarding the continuation of his employment, effectively terminating Plaintiff's employment. The Restaurant has since been marked "permanently closed" on Google.

100. Throughout this entire six-to-seven-month period of severe racial harassment, physical violence, death threats, management's deliberate failure to protect, and unlawful retaliation, Plaintiff suffered devastating psychological, emotional, physical, and financial harm that continues to this day.

101. Once a loving, caring, and outgoing person, Plaintiff now describes himself as the opposite—quiet, introverted, and emotionally withdrawn. The months of being called "NIGGER" repeatedly, seeing those slurs carved into the bench, and enduring credible death threats destroyed Plaintiff's sense of safety and fundamentally altered his personality.

102. Plaintiff now suffers severe depression, anxiety, mood swings, and deep trust issues. The psychological trauma manifests physically through stress-induced eczema, headaches, restless sleep, significant weight loss, and chronic fatigue.

103. Plaintiff sought medical treatment but cannot afford it because he has no health insurance and no income due to Defendants' retaliation.

104. Defendants' conduct also destroyed Plaintiff's professional reputation, and Plaintiff is now discouraged from bartending because he does not want to risk experiencing such trauma again.

**FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION AND HOSTILE WORK ENVIRONMENT UNDER SECTION**
**1981**
*Against Defendant Minato*

105.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

106.   42 U.S.C. § 1981 states, in relevant part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

107.   As described herein, Defendant Minato discriminated against Plaintiff based on his race by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment. Defendant Minato also subjected Plaintiff to harassment and disparate treatment in the terms and conditions of his employment based on his race.

108.   As a result of Defendant Minato's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

109.   Defendant Minato's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

110.   Plaintiff requests relief as hereinafter described.

## SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER SECTION 1981
### *Against All Defendants*

111. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112. 42 U.S.C. § 1981 prohibits employers from retaliating against employees who complain of or otherwise engage in protected activities.

113. As described herein, Defendants violated Plaintiff's rights under Section 1981 by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy retaliation against Plaintiff for his protected complaints of racial discrimination and harassment.

114. As a result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

115. Defendants' conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

116. Plaintiff requests relief as hereinafter described.

## THIRD CAUSE OF ACTION
## FOR DISCRIMINATION AND HOSTILE WORK ENVIRONMENT UNDER THE NYSHRL
### *Against Defendant Minato*

117. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

118. New York State Executive Law § 296 provides that it shall be an unlawful discriminatory practice for an employer, because of an individual's race, to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

119. As described herein, Defendant Minato engaged in unlawful employment practices prohibited by the NYSHRL by discriminating against Plaintiff on the basis of his race by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment.

120. As a result of Defendant Minato's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

121. Defendant Minato's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

122. Plaintiff requests relief as hereinafter described.

**FOURTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE NYSHRL**
*Against All Defendants*

123. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124. New York State Executive Law § 296 provides that it shall be an unlawful discriminatory practice for any person to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

125.    As described herein, Defendants retaliated against Plaintiff for his protected activities under the NYSHRL by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment and by terminating his employment.

126.    As a result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

127.    Defendants' conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

128.    Plaintiff requests relief as hereinafter described.

**FIFTH CAUSE OF ACTION**
**FOR DISCRIMINATION AND HOSTILE WORK ENVIRONMENT UNDER THE**
**NYCHRL**
*Against Defendant Minato*

129.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

130.    New York City Administrative Code § 8-107(1) provides that it shall be an unlawful discriminatory practice for an employer, because of the actual or perceived race of any person, to discharge from employment such person, or to discriminate against such person in the compensation or in terms, conditions, or privileges of employment.

131.    As described herein, Defendant Minato engaged in unlawful employment practices prohibited by the NYCHRL by discriminating against Plaintiff on the basis of his race by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment.

17

132. As a result of Defendant Minato's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

133. Defendant Minato's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

134. Plaintiff requests relief as hereinafter described.

**SIXTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE NYCHRL**
*Against All Defendants*

135. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

136. New York City Administrative Code § 8-107(7) provides that it shall be an unlawful discriminatory practice for any person to retaliate or discriminate in any manner against any person because such person has opposed any practice forbidden under this chapter.

137. As described herein, Defendant retaliated against Plaintiff for his protected activities under the NYCHRL by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment.

138. As a result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

139.  Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

140.  Plaintiff requests relief as hereinafter described.

### SEVENTH CAUSE OF ACTION
### FOR AIDING AND ABETTING DISCRIMINATION UNDER THE NYCHRL
*Against Defendant Luigi Ghidetti*

141.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

142.  New York City Administrative Code § 8-107(6) provides that it "shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce" any of the facts forbidden under the NYCHRL, including racial discrimination. Plaintiff alleges that Defendant Minato committed race discrimination in violation of the NYCHRL (the "Primary NYCHRL Violation").

143.  Plaintiff alleges that the Primary NYCHRL Violation by the Minato is the predicate for imposing aiding-and-abetting liability on Defendant Ghidetti, an individual.

144.  Ghidetti had knowledge of the discriminatory conduct alleged herein. Not only did Ghidetti witness some of the discriminatory conduct, including racial harassment and racist graffiti, but Plaintiff and other employees, such as Abalos, complained of the racial discrimination directly to Ghidetti. Rather than taking corrective action, Ghidetti dismissed the complaints, retaliated against Plaintiff, and stated that the harassment was Plaintiff's "problem."

145.  Ghidetti refused to take remedial action in response to the complaints of racial discrimination.

146.  As a result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress,

including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

147. Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

148. Plaintiff requests relief as hereinafter described.

**EIGHTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING DISCRIMINATION UNDER THE NYSHRL**
*Against Defendant Luigi Ghidetti*

149. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

150. 122. New York State Executive Law § 296 provides that it "shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce" any of the acts prohibited by the NYSHRL, including racial discrimination. Plaintiff alleges that Defendant Minato committed race discrimination in violation of the NYSHRL (the "Primary NYSHRL Violation").

151. Plaintiff alleges that the Primary NYSHRL Violation by Minato is the predicate for imposing aiding-and-abetting liability on Defendant Ghidetti, an individual.

152. Ghidetti had knowledge of the discriminatory conduct alleged herein. Not only did Ghidetti witness some of the discriminatory conduct, including racial harassment and racist graffiti, but Plaintiff and other employees, such as Abalos, complained of the racial discrimination directly to Ghidetti. Rather than taking corrective action, Ghidetti dismissed the complaints, retaliated against Plaintiff, and stated that the harassment was Plaintiff's "problem."

153. Ghidetti refused to take remedial action in response to the complaints of racial discrimination.

154. As a result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

155. Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

156. Plaintiff requests relief as hereinafter described.

## JURY DEMAND

157. Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER FOR RELIEF

158. **WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Section 1981, the NYSHRL, and the NYCHRL in that Defendant Minato discriminated against Plaintiff on the basis of his race and retaliated against Plaintiff on account of his complaints of racial discrimination and harassment, and that Defendant Ghidetti aided and abetted racial discrimination and harassment against Plaintiff and retaliated against Plaintiff for complaints of racial discrimination and harassment;

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental, emotional injury, distress, pain and suffering, and injury to his reputation in an amount to be proven;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of this action; and

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated:  Bellport, New York
June 1, 2026

**MESIDOR PLLC**

Marjorie Mesidor
Katlyn Palmatier
30 Station Road, Suite 5
Bellport, NY 11713
(212) 930-6010
mm@marjoriemesidor.com
kp@marjoriemesidor.com
*Attorneys for Plaintiff*

22